145790 and 14587 In order to support America, we urge you to sign this petition to the vote of the people and to the power of the nation, and to the republic for which it stands, one nation, under God, indivisible, with liberty and justice for all. May it please the court, my name is Josh Townley. I'm here today representing Mr. Terry Honeycutt. I've reserved three minutes for rebuttal. Fine. As the district court stated at the defense's JOA, at the close of the government's case, quote, going back to the way I heard the testimony come out here, I mean, as law enforcement officers were going about their business in this case, it's pretty apparent to me that there was probably confusion even amongst law enforcement about exactly what they were going to do in this case and how to go about doing it. And while I know that the government is arguing that law enforcement either told or sent a message to Mr. Honeycutt to stop doing this, actually, what I heard more from the evidence is law enforcement didn't tell him that, at least not explicitly, probably because they didn't know if they had the authority to, and partially because they didn't know if they wanted to. What I heard more was law enforcement saying, not only condoning, but perhaps even encouraging continued sales of this product if you keep a log for them. And when it became apparent that he wasn't going to be enlisted, you know, as their agent, they changed their mind and said, well, okay, then let's prosecute him. So, I mean, it was a confused thing. Were you saying this as a matter of law shows that your client was not guilty, or are you just saying that there should have been an instruction, or what is the point of this? I mean, the jury heard all this, what you're saying, right? Yes, Judge. It ties into pretty much all of our issues. We have nine issues, and I know that I will not be able to get to all of them here today in the 15 minutes that, you know, I have. But whatever qualifications there were, there was no, there's no question but that law enforcement advised your client that iodine was an ingredient in making methamphetamine, right? Yes, but there's, as far as that goes, that has absolutely nothing to do with the knowledge of illegality that applies to the list one chemical. Well, it does have, it has something to do, I mean, I think if I were selling iodine and somebody told me the reason you're selling so much iodine is they're using it to make meth, I think, you know, I think I'd take that into account and probably stop selling it unless I like the proceeds from the sale of it too much. Well, that's just simply not really what occurred here necessarily. Because they did tell him, they may have said do it if you feel comfortable with it, they may have said keep the law, but they also said it's used to make meth, didn't they? Yes, but I mean, anybody can see that iodine is a product, you know, that is used in the manufacture of methamphetamine. There are many, many, many products that are used to... Oh, and there, I believe there are various ways to make it that use different products. That's correct, but I mean, as far as we're looking at here, we're looking at in the context of the statutes that he's been charged with. Why did he keep the iodine, you know, behind the counter so that it was hard to reach when it was the best selling product? That was just their security measure that they put in place. And if you look at some of the photos... Security for what reason? Basically, the way the store is set up is the smaller products that people could just pick and take out, they put behind the counter and had up, you know, top and around the side. Did they have anything else under the counter besides this Polipur, whatever it's called? Or was that the only product that was under the counter? It wasn't under the counter, it was just in a box off to the side. A marked box or a box saying the brand name? Oh, it just had a bunch of the, basically, they come in little box packages, they're bright, bright blue, and it's kind of just like a cardboard box. Like a little juice thing for a child? Yes, except on the inside, then you have the bottle, which is basically, it has a capturing mechanism on the inside. You pour a little bit of water in there, you kind of let it sift around, and then you put it into drinking water that you need to purify, and then you're able to drink that. But this was, I mean, all sold... And when it was the best-selling product and they were making tons of money on it, that there was a reason why it was back there, and that the reason was that they knew it was illegal to sell it to be used to make methamphetamine. Absolutely not. I mean, first off, they didn't know that it was illegal at all. Our client, Terry Honeycutt, each and every time that he spoke with law enforcement, he particularly brought this to their attention before they even knew about it, and said, you know, I've been noticing some people come in, buying it, and they're a little, I can't hardly keep it on the shelves. Are there any issues with it? Can we sell it? And then eventually they reach the director of the Tennessee Methamphetamine Task Force, who tells them, yeah, it can be used to do that. And then he's looking for guidance, some sort of guidance as far as it goes on what I'm supposed to do as far as this goes. And that's when he says, just don't do it if you feel uncomfortable about it. He's brought then to the other part of law enforcement, who says, we haven't seen any of it anywhere. Go ahead, sell all you want of it. Now, he's a salaried employee, and he's not... The agent actually said, go ahead and sell all you want of it? Who said that? That was a law enforcement officer that our client spoke with when they were going... Basically, he was put on hold, and then he was by, I guess it was the secretary at the time. And then he was... They asked around everyone if they had heard of any issues with it, or if there's anything he needs to do. And they all hadn't heard of anything and just said, no, go ahead, sell all you want of it. When in fact, this is a list one chemical that is in the same class as pseudothedrine. It is absolutely required by the DEA that in order to possess and sell or to distribute this product, you need to be registered with them. Otherwise, you must cease activity. Any distribution you can, it's prohibited. And the only way that you would know this is by looking in the Federal Register, where it was published back in 2007 before this. And that's one of the reasons why we cited to CASEER, as Your Honor, I believe, wrote that opinion, is that in the supplementary information, Polar Pure was specifically listed as a product that must be registered with the DEA, or else you cannot sell it. And in order to do that, and so that's why it's so significant that when he speaks with DEA agent Shelton, and agent Shelton said, well, I think they should just outlaw it. And Terry Honeycutt says, well, if they do that, we wouldn't have to sell it at all. And just a few days prior to this, he is essentially encouraging them to have some sort of database where they can just scan it, and then they know it. Who is encouraging whom? Terry Honeycutt is encouraging them to have a sort of… The DEA? Yes, yes. And say, well, do you have, because it's a lot to do and maintain to just basically, if they're having this problem, can you do like you do with the pseudofedron, which is essentially, you know, they can just scan it with their IDs, and then it's all in this law enforcement database. This part is entrapment by estoppel, right? That was presented to the jury. Yes, and I definitely would like to get to that point. And the jury ruled against your client on that, right? Well, that's because it was, I mean, first and foremost, well, perhaps not foremost, but the fourth element of this court's instruction is unconstitutional on its face and as applied in requiring that prior to conviction and, you know, without admitting, you know, admitting to the act of distributing polar pure is not a crime. So it's not an affirmative defense in this case. It's a defense to, it negates mens rea, which we've talked about here as far as the list one chemical is what they need to have proved here because it's subject to the 20-year maximum as opposed to the list two chemical, which is subject to a 10-year maximum. And so here that accounts for the notice provisions and the requirements that are in place that, you know, that you're presumed to be acting with or not presumed, but you have better notice and responsibility in that you're already registered. You know these requirements. You know what you're supposed to do. And then, you know, when you exceed that, then you're subject to that greater punishment. Are you saying that the court erred by instructing under this standard instruction? Well, no other circuit in the United States requires that at trial and prior to conviction that we must prove to the jury that our conviction would be unfair. Who presented this instruction? This is this court's standard pattern instruction. This court's standard pattern instruction is the only pattern instruction in the United States, and we've outlined this specifically if I direct you to issue five in the third brief. Whose idea was it to put it in? Was that the prosecution or the judge or somebody else? It was our request. We had an alternative request to basically align with our due process rights here, and so that's not a burden-shifting charge as applied, which was that. . . It's an affirmative defense, though, isn't it? Is that what it is? Not in this case, Your Honor, no. Well, you could have just not had it given at all. You didn't ask for that, right? No. Well, we needed the defense, and we couldn't be deprived of this. So first our request was that the government must prove beyond reasonable doubt that either, A, an agent of the United States government did not announce that the Charged Criminal Act was legal, the Charged Criminal Act being the possession or distribution of polar pure, or although an agent of the United States government announced that the Charged Criminal Act was legal, the defendant's reliance on the announcement was unreasonable. So unless the government proves either of those beyond reasonable doubt, then you must find the defendant not guilty. We alternatively requested this court's pattern charge so that we would not be deprived of the defense at trial, as we had acknowledged that the lower courts bound by this court's holding in that regard. But this court in Levin derived the fourth element, which says that, given the defendant's reliance, prosecution would be unfair. And so it's really just these first three, which is entrapment by estoppel. And then given one, two, three, the prosecution would be unfair, and it's dismissed. And so it's our position that, and this was raised in our case and in Levin and in Smith from the First Circuit, which is what Levin relied upon, and I see I'm out of time. If you want to finish your sentence and then choose to do rebuttal, that would be fine, or you can use all your time now, whatever you prefer. But I assume you would like to save your time for rebuttal. Yes, sir. You may proceed. I'm sure the timer is on. May it please the Court, good morning. My name is Jay Woods. I'm here for the United States in this case. I would like to reserve four minutes of rebuttal time. Fine. The United States asked for oral argument on a specific issue, and that's the issue of forfeiture, and that's where I'm going to begin. The forfeiture statute is clear and unambiguous. Forfeiture is mandatory when the United States meets three particular requirements, and the United States met those three requirements here. However, the district court failed to order forfeiture in this case, and in doing so the district court committed two very precise errors. The first was an error as a matter of law. Is the district court required to declare forfeiture here, or is there any discretion? There is no discretion for the district court. Where the United States meets the three Hampton requirements that are both in the case law or they're in the statute but they're teased out in the Hampton case, in that case there is no discretion for the district court. Forfeiture is mandatory. Well, isn't there a big debate now looking at the first, sorry, at the D.C. Circuit decision in Cano Flores whether or not 853 would require forfeiture in the context of this individual defendant? In the context of this defendant, the 853 defines the broad nature of the statute, but it's the Title 28 code section that mandates forfeiture here. But my understanding is that there is an issue under 853A whether we have property constituting or derived from proceeds the person obtained as a result of such a violation. In this case what we have is a conspiracy, and the defendant that's involved in this conspiracy is obtaining proceeds for the conspiracy. And it doesn't say obtain and retain. It says obtained proceeds. So in the broad liability that comes with a conspiracy, the defendant's obtaining of proceeds for the conspiracy opens the door to mandatory forfeiture for that defendant for the proceeds generated for the conspiracy. But it requires forfeiture of any property derived from any proceeds. So hypothetically, let's assume that this defendant, and I think this is the facts, but he's selling the iodine that's going to be used in the meth, but he is just a salesperson. He's not an owner. He's not getting anything at all. Does he have any property obtained directly as a result of such a violation? And my understanding of the D.C. Circuit in this case that I cited, Cano Forest, my understanding of that is that the D.C. Circuit says, no, you cannot use conspiracy law to say, well, there were other people in the conspiracy who in fact had a lot of property or should have had a lot of property as a result of all of these sales. You cannot sort of leapfrog on top of the conspiracy theory. Now, I can understand that there are circuits that go the other way, but why shouldn't we go the way the D.C. Circuit has gone? First, if I could address the factual issues. The defendant was a salaried employee. That we don't dispute. The record clearly establishes that he's a salaried employee. However, the record also establishes his role at the business where this conspiracy was occurring. His responsibility was to order inventory, to maintain that inventory, and also, as the court has already noted, to engage in the sales of the iodine. So he had a hand at every step of the conspiracy. And I'm not disputing that at all. The question is, what's he going to forfeit if he is just a salaried employee and, hypothetically, he's not retained anything, he's not taken anything, even if he had taken it and then spent it. He is just working away because his brother is the manager of the store and has this bright idea. Hypothetically, it's his brother who had this. But he—I'll grant you all the facts that you just stated. That's the matter of—the mistake is a matter of law that the district court committed because— Well, the point, Judge Moore—I don't mean to jump in. The point Judge Moore is making is there's another way of looking at this legally. And the question is, why should we look at it the way that some of the other circuits have looked at it rather than the way the D.C. Circuit has looked at it? And the way the other circuits have looked at it raises real practical problems because if you're imposing what is essentially joint and several liability among co-conspirators, you're—and if you're imposing Pinkerton-type rules on a forfeiture statute, it's a pretty impractical thing because you have no practical way of getting money for many of the co-conspirators, and that's not where the proceeds are. Yes, ma'am. Respectfully, I think it's important to look at how the Sixth Circuit has handled this. And it is in contrast to how the D.C. Circuit has handled this case. Well, we have an unpublished case, but I'm not aware of any published case that establishes our rule with respect to this. Yes, ma'am. I would ask— Do you disagree? Yes, ma'am. I would invite the Court's attention to the Dargy case. Can you spell the name of that? Ma'am? Could you spell the name? Yes, ma'am. D-A-R-J-I. And it is an unpublished case. I'm sorry. I thought it was—when I first looked at it, I thought the citation was different, and I apologize. Well, I think we're back where we started from. So that's my fault. I'm sorry. Ma'am? I think we're back where we started from. Yes, ma'am. Are you conceding that we do not have a published Sixth Circuit case on this topic? I think that the closest that we have to a published case on this topic that gives us direction is the Warshak case, 631 F. 3rd. 266. And in that case, it observes that proceeds that are indirect or direct, that even those that come from legitimate sales, which is not the argument that I want to make here, but all the sales that result indirectly or directly are forfeitable. Warshak did not involve a conspiracy, did it? I don't think it did. It involved an individual, and the question was how far the forfeiture statute reached, not who has to be responsible for the forfeiture, isn't it? The only other answer I have here dealing with the broad scope of the conspiracy and taking that analogy to the forfeiture is the Corrado case. The defendant there was involved in a criminal enterprise, and there was no evidence in that case about what portion of the proceeds that the defendant himself received. How much forfeiture does the court have to do? 20% or 50% or something like that? That draws two answers. The first is here the United States sought forfeiture of only the proceeds, very proportional response, that only the profit that was made from selling this list chemical was sought. So no, there's not a percentage. We're not looking for a brick-and-mortar building or anything like that. We're looking for only the proceeds, the profit that was made here. And the second issue... Was that seized someplace? I mean, is that just a hollow act here by the court saying forfeit $250,000 but you don't have it in a bank account or something? Or was it seized someplace? It was not seized, no sir. Do you know that this defendant has any money? I mean, are we just talking about an interesting and important academic issue? I know that the defendant has real property. So you would seek the forfeiture of that real property? Substitute assets, yes ma'am. Okay. So to get back to the law question, which is, of course, very important, Corrado is the case that you mentioned. And the problem with Corrado is it's a different statute than this particular one. But the problem in response would be that the statute that's involved in Corrado is using the same language. Is using consistent language with the position that we're taking? Yes, ma'am. That would be it. Does the government have a burden to establish that proceeds did go to the particular defendant against whom you're seeking forfeiture? I mean, I can foresee, for example, if you establish that his salary was increased as a result of the profitability of the iodine or something like that, then perhaps you'd have an argument. But as it is, you're forced to rely on a purely legal argument that doesn't give you any burden of proof. Well, the three requirements that are teased out in Hampton, I believe, does give us a burden of proof. If we had failed to convict the defendant, we would not have met our burden of proof, and this would be completely moot. Well, of course. So we did go through the process of… But you didn't go through any separate burden with respect to forfeiture. No, ma'am, we didn't, but the proof established at trial was very strong. The records that established the profit from this came directly from… But it didn't address at all the question of whether this defendant personally benefited, did it? No, it did not. The defendant was a salaried employee, so at least some portion of this profit went into his salary. But you're not limiting the forfeiture for him to his salary. You're saying for him, you can use substitute assets and you can look at the whole amount that the conspiracy profited and go at… Like, say he has a beautiful farm because somehow or other he inherited it from somebody. You could go after that beautiful farm. To satisfy the portion of proceeds that were generated by the conspiracy. The whole conspiracy, because it's joint and several liability under your theory. And that's one of the things I do want to address, because joint and several liability doesn't apply in this case. The first defendant that pleaded guilty in negotiating his plea agreed to forfeit his interest in the proceeds. And so the remainder of that isn't subject to a joint and several argument. The remainder of that proceeds is the defendant's obligation. There were only the two of them? There were only two defendants that were charged in this case. But there were others as part of the conspiracy? So then this defendant would be liable under your theory for the other defendants, not the one who's settled. There was an unindicted co-conspirator who was the wholesaler for the list chemical who was under investigation in California. Thank you. Thank you. First, as far as the forfeiture issue, we simply – I mean, we would just simply direct the court to our response in the third brief. And in the event that this court reaches it, which we submit that it should not. And then as far as – we're talking about conspiracy. The conspiracy that Tony Honeycutt, the brother, pled guilty to was 843A6. And 843A6 charges chemicals, products, materials. Well, that as a matter of law is not polar pure. So what he pled guilty to as a matter of law has nothing to do with polar pure. Because polar pure at all times is a list one chemical, which basically enlisted chemicals are punishable only in 841C2. This is addressed in issues one and two of our brief. And as far as that goes, a list one chemical means – or enlisted chemical means any list one chemical or any list two chemical. And chemical is not defined in the Controlled Substances Act. But list one chemical is defined, which is – and is important to the manufacture of the controlled substances. List two is also defined. The emphasis point there is on – is used. Chemical we submit based on reading the statute as – the statutory scheme as a whole simply means that it's unlisted and may be used. I don't see just reading the plain language of 843A6. I'm not seeing why it isn't applicable here. And I'm wondering if – I mean to the co-defendant. And I'm wondering what conspiracy you think he pled guilty to. Well, as a matter of fact and law, the polar pure, which contains iodine… What conspiracy did he think he was pleading guilty to? To sell something else? No. It was this conspiracy, wasn't it? The same one of which your client was convicted. That – I mean we – that's what our appeal centers in large part about is that the district court read these statutes in a manner that says that, you know, they're ambiguous. They're redundant. Basically, a listed chemical is the same thing as a chemical. And then on the verdict form, he put precursor chemical, removed all the mens rea, and just submitted it to the jury. And, you know, the jury and the district court – I mean and the, excuse me, the government says, well, this doesn't give the kind of direction that the jury needs. That the jury needs basically in order to convict the defendant with, you know – anyway, I see my time's up. Thank you. Thank you. Briefly, I want to turn to the defendant's estoppel argument and then I have a feeling. Wait a minute. This is your rebuttal on forfeiture. Yes, ma'am. You're right. I went back and reviewed my notes and turned – I would like to invite the court's attention to maybe consider the fact that in conspiracy law, we look at the foreseeable results. And when the defendant engages in that conspiracy, the consequences of that conspiracy that are foreseeable to the defendant are held against him in a prosecution. That same logic in several unpublished opinions by this court supports the government's argument here where we are seeking a – we're seeking the foreseeable proceeds from the defendant's actions. That's the amount of money that we're seeking to forfeit. That's absolutely true as a matter of conspiracy law. But the statute doesn't necessarily contemplate taking that approach. Would that be a fair statement? That would be a fair statement. The statute does not contemplate the idea that a defendant who contributes to a conspiracy but does not directly benefit may be in this exact situation. Well, the court said that it couldn't find that the defendant profited from this enterprise, right? Yes, sir. The court did observe that he could not find – and there is no evidence in the record other than his salary. So I can't stand here and argue that he directly profited. So if he didn't directly profit, the court still has to have a forfeiture? Judge, as a matter of law, that is our position, that as a matter of law, the liability of the conspiracy extends to the forfeiture. And does the court have to determine how much of this Polar Pure was sold for illegal purposes as against legal purposes? Because that's one of the problems that the court had. And that would be the error of fact that we believe that the district court committed. Here in this case, the district court determined that there may have been some legitimate sales. The fact of the matter, though, is the record does not support that at all. There is no evidence in the record of a lawful or legitimate sale of iodine. All of the sales that were prosecuted in this case that were maintained in these records that the defendant was responsible for generating, all of those sales were made with a reasonable, knowingly or reasonably believing that the possibility that iodine could be used in manufacturing methadone. But whose burden is it to show this? Is it the government's burden? It is. It is our burden to a preponderance. Okay, so presumably Polar Pure is a legitimate product for campers or people who are needing to purify their water, right? It was once a legitimate product for that purpose. These days, technology has far suppressed iodine as a water purification product. I don't think we have any more questions. Yes, ma'am. In that case, we ask that you vacate the district court's failure to order forfeiture and remand for consideration of forfeiture in this case. Thank you for your time. Thank you both for your argument. The case will be submitted. Would the clerk call the next case, please?